UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

UNITED STATES OF AMERICA,        .      Case No. 1:17-MJ-00164-ML-1
                                 .
                                 .      U.S. District Court
vs.                              .      501 W. 5th Street, Ste. 4150
                                 .      Austin, TX  78701
HO KA TERENCE YUNG,              .
                                 .      February 23, 2017
                Defendant.       .
. . . . . . . . . . . . . . . .

TRANSCRIPT OF DETENTION HEARING
BEFORE HONORABLE MARK LANE
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Government:        Office of the United States Attorney
                           By:  MATTHEW B. DEVLIN, ESQ.
                           816 Congress Avenue
                           Suite 1000
                           Austin, TX  78701


For the Defendant:         HANS VIKTOR OLAVSON, ESQ.
                           1107 Nueces
                           Austin, TX  78701




Proceedings recorded by electronic sound recording, transcript
produced by transcription service.
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

2

<u>I N D E X</u>

|                                           | PAGE |
|-------------------------------------------|------|
| **WITNESSES FOR THE GOVERNMENT**          |      |
|                                           |      |
| TIMOTHY M. SELLERS                        |      |
|   Direct Examination by Mr. Devlin        | 6    |
|   Cross-Examination by Mr. Olavson        | 11   |
|                                           |      |
| **WITNESSES FOR THE DEFENDANT**           |      |
|                                           |      |
| CHING NANCY YUNG CHOW                     |      |
|   Direct Examination by Mr. Olavson       | 21   |
|   Cross-Examination by Mr. Devlin         | 32   |
|   Redirect Examination by Mr. Olavson     | 41   |

| **EXHIBITS**:        | IDEN. | EVID. |
|----------------------|-------|-------|
| G1   Sealed Exhibit  | 8     | 8     |
| G2   Sealed Exhibit  | 9     | 10    |
| G3   Sealed Exhibit  | 9     | 10    |
| G4   Sealed Exhibit  | 9     | 10    |

**CLOSING ARGUMENTS:**
On Behalf of Government:
| By Mr. Devlin           | 43 |
|-------------------------|----|
On Behalf of Defendant:
| By Mr. Olavson          | 54 |

Case: 17-2334 Document: 003112673809 Page: 3 Date Filed: 07/13/2017
Case 1:17-cr-00014-LPS Document 79-2 Filed 02/12/19 Page 3 of 68 PageID #: 516

3

1    (Call to Order of the Court)

2         THE CLERK:  Clerk calls Case 17-M-164, United States

3    versus Ho Ka Terence Yung for detention hearing.

4         MR. DEVLIN:  Matthew Devlin, for the United States.

5         MR. OLAVSON:  And I'm Viktor Olavson, for Mr. Yung.

6         THE COURT:  And Mr. Olavson, just for the record, is

7    it your intention, right now you've been retained for purposes

8    of the issues in the Austin Division of the Western District of

9    Texas.  Is that right?

10        MR. OLAVSON:  That is correct.

11        THE COURT:  All right.

12        MR. OLAVSON:  And I've not been retained, nor do I

13   want to represent to the Court that I will be representing him

14   in Delaware, Your Honor

15        THE COURT:  Very good.  Mr. Olavson, we were

16   originally set for an identity hearing and a detention hearing.

17   As it relates to the issue of identity, the clerk advised me

18   that it's your intention, on behalf of your client, to waive

19   that hearing.

20        MR. OLAVSON:  Yes, it is, Your Honor, and I have that

21   paperwork in front of Mr. Yung right now.

22        THE COURT:  All right.  Do you need anymore time to

23   talk with him about that?

24        MR. OLAVSON:  No, sir.  I think -- well, let me --

25   can you give me five seconds?

1          THE COURT:  Sure.

2      (Pause)

3          MR. DEVLIN:  You're waiving identity?

4          MR. OLAVSON:  Thank you, Your Honor.

5          THE COURT:  You're welcome.  So gentlemen, that

6  leaves the issue of detention.  Mr. Devlin, of course you know,

7  you filed a motion to detain, suggesting the man is a danger to

8  the community and/or a person in the community, as well as a

9  risk of flight.  So the burden being yours, you may proceed.

10          MR. DEVLIN:  Thank you, Your Honor.  First of all, I

11  would ask that the Court take judicial notice of the indictment

12  that was handed down in the District of Delaware, on I guess

13  the defendant, which I believe has been unsealed and I believe

14  the Court has a copy of that.

15          THE COURT:  I do have one in front of me.  Mr.

16  Olavson, is there any objection to me doing so?

17          MR. OLAVSON:  No, Your Honor, as long as I get a

18  copy.  I tried to find it online this morning on Pacer, and it

19  was not publicly available at 8:30 this morning.  So if I could

20  be blessed with a copy, as well.

21          MR. DEVLIN:  I have it.

22          THE COURT:  Very well.  All right.

23          MR. OLAVSON:  I have no objection.

24          THE COURT:  Do you have an extra copy, Mr. Devlin?

25          MR. OLAVSON:  Or if I could just review it briefly,

1 Your Honor.

2          THE COURT:  Yes.  Please do; please.

3     (Pause)

4          MR. OLAVSON:  I see that there's nothing in there.

5 Judge, is it possible for me to just glance at the Court's

6 copy?

7          THE COURT:  Yes, of course.

8          MR. OLAVSON:  Thank you.  Thank you.

9          MR. DEVLIN:  Sorry.  I --

10          MR. OLAVSON:  May I approach.

11          THE COURT:  Yes.  And we'll get you a --

12          MR. OLAVSON:  I'm sorry.  I did try to download that

13 early this morning.

14          THE COURT:  No.  That's quite all right.

15          MR. OLAVSON:  And just state that the clerk's in

16 Delaware aren't as efficient as the ones we have here.

17          THE COURT:  Well, that goes without saying.

18          MR. OLAVSON:  Yes, of course, Your Honor.

19          THE COURT:  Everything's better in Tax Court.  Right,

20 Mr. Olavson?

21          MR. OLAVSON:  Well, yes, sir.

22          THE COURT:  Of course.

23          MR. OLAVSON:  Well, thank you.  Thank you.  I

24 apologize.

25          THE COURT:  All right.  And there's a copy for you,

                    Sellers - Direct/Devlin                    6

1   finally.

2              MR. OLAVSON:  Oh, thank you.

3              THE CLERK:  You're welcome.

4              MR. OLAVSON:  See, my briefest commentary about

5   efficient clerks --

6              MR. DEVLIN:  I'd like to call Special Agent Tim

7   Sellers to the stand.

8              THE COURT:  All right.  Agent Sellers, if you'd come

9   forward, make your way to the witness chair here, we'll get

10  started.  If you'd initially raise your right hand, you'll be

11  sworn.

12          TIMOTHY M. SELLERS, GOVERNMENT'S WITNESS, SWORN

13             THE COURT:  Sir, if you'd have a seat.  Make yourself

14  comfortable.  When you're ready, give us your full name.  Spell

15  your last name.

16             THE WITNESS:  Timothy M. Sellers, S-e-l-l-e-r-s.

17                      DIRECT EXAMINATION

18  BY MR. DEVLIN:

19  Q    How are you employed, Agent Sellers?

20  A    I'm a special agent with the FBI.

21  Q    Okay.  And are you familiar with the investigation

22  involving the defendant here, Mr. Yung?

23  A    Yes, I am.

24  Q    All right.  And you are the lead case agent, but you've

25  conferred with the case agent.  Is that correct?

Case 1:17-cr-00014-LPS Document 72 Filed 02/13/19 Page 7 of 68 PageID #: 520
Case: 17-2334 Document: 003112673809 Page: 7 Date Filed: 07/13/2017

1  A     That's correct.

2  Q     Lead case agent is out of Baltimore, actually.  Is that

3  right?

4  A     Baltimore or Wilmington, RA.

5  Q     All right.

6         MR. DEVLIN:  May I approach the witness, Judge?

7         THE COURT:  Mr. Devlin, you never have to ask me,

8  just --

9      (Counsel conferring at counsel table)

10         MR. OLAVSON:  So it's the same search warrant I have.

11         MR. DEVLIN:  Yes, sir.  Okay.  Judge, the first thing

12  I'd like to do is actually proffer Government Exhibit 1, which

13  is an excerpt of the sealed search warrant affidavit that was

14  authorized by this Court in Cause Number A-17-M-161.  It's an

15  excerpt of just the probable cause section of it, on pages 4

16  through 83.  It doesn't have any of the other search warrant-

17  related items.

18         I have provided Mr. Olavson with a copy of the full

19  search warrant affidavit and I would like to proffer this as

20  basically setting forth the facts that we will present here at

21  this hearing.

22         MR. OLAVSON:  No objection, Your Honor.

23         THE COURT:  All right.  Well, that'll -- that proffer

24  then will be accepted, given that there's no objection.  Mr.

25  Devlin, does that document need to be sealed?

1          MR. DEVLIN:  Yes, it does, Judge.  I would like to

2   seal it, and I -- in fact, I'm going to substitute for it, as

3   well, because I double-sided it instead of single-sided it.

4          THE COURT:  Okay.

5          MR. DEVLIN:  So I may substitute for it later, but

6   yes, I would like --

7          THE COURT:  Yes.

8          MR. DEVLIN:  -- to ask that Government Exhibit 1 be

9   sealed.

10         THE COURT:  Okay.  Government's Exhibit Number 1 will

11  be sealed, and you can work with Ms. Williams here on getting

12  an amended version submitted.

13         MR. DEVLIN:  Yes.

14         THE COURT:  Okay.  Go ahead.

15      (Government Exhibit 1 was received into evidence under

16  seal.)

17         MR. DEVLIN:  Thank you.

18  BY MR. DEVLIN:

19  Q    Agent Sellers, first of all, the facts that are in the

20  search warrant affidavit, you swore out the search warrant

21  affidavit.  Is that correct?

22  A    Yes, I did.

23  Q    And the excerpt that was presented to the Court from pages

24  4 through 83 of the affidavit were part of it.  Is that right?

25  A    Correct.

1  Q    And do you still assert that those facts are true and

2  correct, to the best of your knowledge?

3  A    Yes, I do.

4  Q    Okay.  I'm going to show you what's been marked as

5  Government Exhibit 2.  Do you recognize that?

6  A    Yes.

7  Q    And is that a statement from the wife of the victim in the

8  case whose first name is Bob?  Is that correct?

9  A    Yes.

10 Q    And this is a statement concerning basically what she

11 would like the Court to consider for her as to the detention

12 issue.  Is that correct?

13 A    Correct.

14 Q    I'm going to show you what's been marked as Government

15 Exhibit 3, and that is a statement from the -- a colleague of

16 the victim who we'll refer to as Bob Ormley (phonetic).  Is

17 that correct?

18 A    That's correct.

19 Q    Is that, again, a statement that the person wishes to have

20 the Court consider as to the detention issue?

21 A    Yes, it is.

22 Q    And let me show you what's been marked as Government

23 Exhibit Number 4.  Is that a letter from the Dean of Admissions

24 at Georgetown University Law Center regarding the detention

25 issue, as well?

1  A    Yes.

2  Q    And there's been some redaction there.  I guess that's

3  redaction of the named victim's name. Is that correct?

4  A    Correct.

5         MR. DEVLIN:  Okay.  I've given copies of all these to

6  Mr. Olavson.  I would like to move to admit Government Exhibits

7  2, 3 and 4 for purposes of this hearing only.

8         MR. OLAVSON:  No objection.  Are these under seal,

9  just out of curiosity, Mr. Devlin?

10         MR. DEVLIN:  These are -- these -- I would ask that

11  they be under seal.  There's nothing revealing in them as far

12  as any of the victims' names and as far as protective orders.

13  So --

14         THE COURT:  Okay.  We'll --

15         MR. DEVLIN:  -- I don't have an objection to that.  I

16  would ask that they be filed under seal.

17         THE COURT:  Okay.  Well, then Government Exhibits 2,

18  3 and 4 are admitted for purposes of our hearing, and I note

19  that this -- frankly, everything that we're doing here in

20  Austin is ancillary to what is going to take place in the

21  future in Delaware.

22         I'll leave to the judges up in Delaware whether or

23  not this material needs to be unsealed at some point.  So 2, 3

24  and 4 will be sealed for purposes of this hearing, as well.

25      (Government Exhibits 2, 3 and 4 were received into

Sellers - Cross/Olavson                    11

1  evidence under seal.)

2          MR. DEVLIN:  And Judge, I believe -- since identity's

3  been waived, I believe that is all that I have to present at

4  this time in terms of the facts.

5          THE COURT:  Okay.  Thank you, Mr. Devlin.

6          Mr. Olavson, sir, do you have any evidence that you'd

7  like to present?

8          MR. OLAVSON:  Could I cross-examine --

9          THE COURT:  Oh, I apologize to you.  I neglected to

10  give you that opportunity.  Thanks.

11          MR. OLAVSON:  Thank you.  Yes, I do have some

12  evidence, as well.

13          THE COURT:  Yes.

14          MR. OLAVSON:  If I could ask --

15          THE COURT:  All right.

16          MR. OLAVSON:  Agent Sellers a few questions.

17          THE COURT:  Yes.  I apologize.

18                      CROSS-EXAMINATION

19  BY MR. OLAVSON:

20  Q    How long have you been working on this case, sir?

21  A    Since August of 2016.

22  Q    All right.  And is that when the FBI first became involved

23  in this investigation?

24  A    No.  FBI became involved earlier, but that was up in the

25  Wilmington resident agency, out of Baltimore Division.  It came

Sellers - Cross/Olavson                                    12

1  to our attention here in Austin in August when I was sent a

2  lead.

3  Q    All right.  But you're quite familiar with the case, sir?

4  A    Yes, sir.

5  Q    All right.  And you're familiar that the victim and the

6  victim's acquaintances have expressed a great deal of concern

7  and consternation about their safety, right?

8  A    Correct.

9  Q    And that's the purposes of Government Exhibits 2, 3, 4,

10 right?

11 A    Correct.

12 Q    All right.  And in fact, you were in contact with them as

13 recently as yesterday or today on that very subject, right?

14 A    I wasn't in direct contact with them.  I just received the

15 letters for you.

16 Q    All right.  But plainly, the victims in the case were

17 notified yesterday that Mr. Yung was arrested here in the

18 Western District of Texas, correct?

19 A    Correct.

20 Q    And obviously, somebody contacted them to see if they

21 would have an opinion about whether or not Mr. Yung should be

22 released on bond, correct?

23 A    I believe so, yes.

24 Q    And then they communicated the contents of those exhibits

25 to you?

                    Sellers - Cross/Olavson                    13

 1  A    Correct.

 2  Q    All right.  They -- the conduct in this case according to

 3  the indictment supposedly ranges from April of 2015 all the way

 4  to October 29th, 2016.  Is that correct, sir?

 5  A    Yes.

 6  Q    When was this indictment obtained?  It says February 16th.

 7  I'm sorry.  Is that --

 8  A    That's correct.

 9  Q    Okay.  Is -- are you aware of any conduct that took place

10  after October 29th of 2016, sir?

11  A    I am not.  What I am aware of is the legal process was

12  completed in October, meaning subpoenas and search warrants to

13  get whatever information the Baltimore Division needed to

14  analyze all the information to proceed with an indictment.  So

15  because nothing was presented legally after October, I'm not

16  sure what the last date was, we don't know if there's any

17  continued activity.

18  Q    Well, your office was contact with him on February 21st

19  and 22nd to get their full input regarding their position on

20  detention, right?

21  A    Correct, yes.

22  Q    So would it be fair to say that if there were additional,

23  more recent events they would have included that in the several

24  pages of single-spaced statements that they gave you?

25  A    If we knew about them they would have been included.

1  Q    Okay.  So there was ample opportunity to find out if this

2  horrendous conduct committed by somebody continued after

3  October 29th, correct?

4  A    There was a lot of information to go through, so -- which

5  was the focus.  So there was no need to continue to search for

6  additional probably cause.  We had the probable cause that we

7  needed.  It just took a few months to get everything sealed up

8  and put together.

9  Q    Yes, sir.  But you went through the various communications

10 with some care prior to testifying here today?

11 A    Yes.

12 Q    Is that fair?

13 A    Um-hum.

14 Q    And if somebody had said, oh, you know, additional death

15 threats or acts of harassment had occurred, be pretty safe to

16 say that you'd know about it?

17 A    Yes.

18 Q    Thank you.  Mr. Yung was arrested on February 21st here in

19 Austin, Texas, Correct?

20 A    Correct.

21 Q    And you had determined that he lived in an apartment over

22 there off Guadalupe Street, right?

23 A    Yes, that's correct.

24 Q    All right.  And did you also determine as part of your

25 investigation that he was a student at the University of Texas?

1  A    Yes, sir.

2  Q    At the law school?

3  A    Yes.

4  Q    And a third year law student?

5  A    Yes.

6  Q    And did you get a copy of his schedule?

7  A    No.  Never had a copy of his schedule.

8  Q    Did you ascertain with anybody whether or not he was in

9  good standing with the university?

10 A    Spoke to the assistant dean --

11 Q    All right.

12 A    -- at the law school, yes.

13 Q    And did the assistant dean indicate anything to you about

14 Mr. Yung's character?

15 A    What was indicated was the fact that he was on probation

16 regarding an earlier incident in which he had submitted an

17 altered transcript to Federal Judge Hudspeth, and -- I'm not

18 sure when that -- it was August 4, 2015.  He had submitted that

19 to the judge and they realized that it had been altered with a

20 -- GPA was taken out and also, one of his criminal law classes,

21 the C+ he received was altered.  They informed UT and UT put

22 him on probation.

23 Q    Yes, sir.  And this is the information that you put into

24 your search warrant affidavit?

25 A    Correct.

1  Q    And that was an academic probation, correct?

2  A    Correct.

3  Q    But in terms of Mr. Yung doing anything else since August

4  of 2015 at UT, the assistant dean didn't tell you anything like

5  that?

6  A    No, sir.

7  Q    Didn't tell you that other students had complained about

8  him?

9  A    No, sir.

10 Q    Or that he was missing classes?

11 A    No.

12 Q    Exhibiting erratic behavior, anything of that nature?

13 A    No, sir.

14 Q    And no doubt, you did a full criminal history on Mr. Yung?

15 A    Yes.

16 Q    And what kind of databases did you search for that, sir?

17 A    Just the regular NCIC, TCIC, our wants and warrants, just

18 anything that when you do a normal criminal history check

19 you're going to get local, state, federal, and then a current

20 wants and warrants.

21 Q    Yes, sir.  And did you find anything at all?

22 A    Nothing.

23 Q    Would that even show --

24 A    No criminal history.

25 Q    -- that you get a traffic ticket?

Sellers - Cross/Olavson                    17

1  A    We would have seen that, but just in terms of criminal
2  history, we were not seeing -- we did not see anything.
3  Q    Yes, sir.  So what time did you serve that -- take a step
4  back.  Were you part of the police officers that executed that
5  search warrant?
6  A    Yes, sir.
7  Q    And that was at his residence at approximately 6:00 a.m.
8  on February 21st?
9  A    Yes, that's correct.
10 Q    All right.  And did you knock on the door or did you knock
11 it down?  Or how did that happen?
12 A    We knocked on the door, and best of my recollection three
13 or four times, very loudly, with a knock and announce, FBI
14 search warrant, open up.  And then after the third or fourth
15 time the tactical team lead advised us to breach the door,
16 because there was no activity inside, no movement towards the
17 door that we could hear.
18 Q    Yes, sir.  And after this dynamic entry did you encounter
19 any people inside that apartment?
20 A    Yes.
21 Q    And Mr. Yung, obviously?
22 A    Mr. Yung.
23 Q    Anyone else?
24 A    That was -- he was the only one inside.
25 Q    And what was Mr. Yung doing at the time that you

 1  encountered him?

 2  A    I couldn't see, but it looked like he was just opening the

 3  bedroom door, from what I was told, to come out.

 4  Q    All right.

 5  A    Into the livingroom.

 6  Q    It appeared that he was -- he had been sleeping at 6:00

 7  a.m.?

 8  A    Yes.

 9  Q    Did he offer any kind of resistance?

10  A    No.

11  Q    To any of the agents?

12  A    No, no resistance.

13  Q    And since you had a search warrant, I assume that you and

14  your fellow agents searched his apartment, correct?

15  A    That's correct.

16  Q    And you seized a variety of computer equipment at that

17  time?

18  A    Correct.

19  Q    Were you looking for firearms?

20  A    We weren't looking for firearms, no.  Well, we --

21  actually, you'd have to clear a place, so you're looking for

22  firearms just to make sure that there's nothing, you know, that

23  no firearms are loaded or nothing was found.

24  Q    All right.  You didn't find any firearms, though?

25  A    Correct, no firearms.

1  Q    Okay.  Did you find any other type of weaponry, sir?

2  A    No.

3  Q    Nothing indicating that he was constructing any

4  destructive devices, anything of that nature?

5  A    Nothing, no.

6  Q    Could you describe just generally the way his apartment

7  looked?  I mean, was it clean, well-kept, pig sty?

8  A    It wasn't a pig sty, but it was -- he had -- when you walk

9  into the door the livingroom's off to the left, he had a lot of

10 HEB bags with paperwork and different things.  I didn't really

11 get a good look.  I wasn't part of the search team, just part

12 of the entry team and then we took him back up for a possible

13 interview.

14     His bedroom was pretty organized.  So it wasn't exciting.

15 It wasn't perfectly clean, but it was -- it was rather -- it

16 was reasonable.

17 Q    Was it what you would expect a college student's --

18 A    Yeah.

19 Q    -- apartment to kind of look like?

20 A    Um-hum.

21 Q    Thank you.  And obviously, you were looking for evidence

22 connecting him with the victims in the case.  Did you at first

23 blush, first glance, did you see anything?

24 A    I didn't, no, sir.

25 Q    All right.  It wasn't like he had pictures of them up on

1  the wall?  You know, you see in the movies with all the crazy

2  people they post things all over the place to keep track of

3  their compulsions and obsessions?

4  A    Nothing like that.

5        MR. OLAVSON:  May I have one moment, please?

6        THE COURT:  Of course.

7    (Pause)

8  BY MR. OLAVSON:

9  Q    Did the assistant dean say that Mr. Yung had previously

10 been on academic probation or that he was still on --

11 A    I believe it was --

12 Q    -- academic probation?

13 A    -- I believe it was he had previously been on probation.

14       MR. OLAVSON:  Thank you.  I pass the witness.

15       MR. DEVLIN:  I have nothing else, Your Honor.

16       THE COURT:  All right.  Agent Sellers, thank you,

17 sir, you can step down.

18    (Witness excused)

19       MR. DEVLIN:  I have no additional evidence --

20       THE COURT:  Okay.

21       MR. DEVLIN:  -- and would pass.

22       THE COURT:  All right.  Very good.  Mr. Olavson.

23       MR. OLAVSON:  Yes, sir.  I want to call Dr. Nancy

24 Yung, please.

25       THE COURT:  Dr. Yung, if you'd come forward and like

Yung - Direct/Olavson                                    21

1  the agent before you, make your way to this witness chair,

2  please.

3           DR. YUNG:  Thank you, Your Honor.

4           THE COURT:  And initially raise your right hand and

5  you'll be sworn by the clerk.

6       CHING NANCY YUNG CHOW, DEFENDANT'S WITNESS, SWORN

7           THE COURT:  If you'll have a seat.  Make yourself

8  comfortable and give us your full name, and spell your last

9  name, please.

10          THE WITNESS:  Full name, C-h-o-w.  Start over again.

11 Full name is Ching, C-h-i-n-g, Nancy, N-a-n-c-y, and last name,

12 Yung Chow, C-h-o-w.

13                    DIRECT EXAMINATION

14 BY MR. OLAVSON:

15 Q   Dr. Yung, you're related to Terence Yung, the defendant,

16 correct?

17 A   Yes, my son.

18 Q   Okay.  And you are here together with your husband and his

19 father, Frederick Yung, correct?

20 A   Yes.

21 Q   And he's present out in the audience?

22 A   Yes.

23 Q   And I understand that you first found out about this

24 yesterday.  Is that correct?

25 A   Yes.

 1  Q    And you made the decision that you wanted to fly here from
 2  your home, correct?
 3  A    Yes.
 4  Q    And you got in pretty late last night?
 5  A    Yes.
 6  Q    And you had told me that you suffer from some health
 7  problems, correct?
 8  A    Yes.
 9  Q    So do you feel like you are a good place to testify here
10  today?
11  A    Yes.
12  Q    All right.
13  A    No problem.
14  Q    Will you let me know if you feel unwell, please?
15  A    I will do.
16  Q    All right.  Thank you.  Where do -- let me get a little
17  bit of information about you and your family first.  You were
18  born in Hong Kong, correct?
19  A    I was born from mainland China.
20  Q    All right.  And you immigrated to the United States in
21  what year?
22  A    It's 1996.
23  Q    1996.  And subsequent to you immigrating to the United
24  States did you and your family become naturalized citizens?
25  A    Yes.

1  Q    Do you remember approximately when that happened, ma'am?

2  A    After four or five years, 1994, '5, that will be 1999.

3  Q    So yourself, your husband and both of your children,

4  including Terence?

5  A    Yes.

6  Q    Have been United States citizens for over 15 years?

7  A    Yes.

8  Q    And do you know if Mr. Yung has a United States passport?

9  A    Yes.

10 Q    Do you know where that is?

11 A    I don't know.

12 Q    You assume that it's with him somewhere in Austin?

13 A    I believe so.

14 Q    All right.  Do you -- are you aware of any travels he's

15 made recently outside the United States?

16 A    Recently, he has no plans.

17 Q    Okay.  Does he have any close contacts outside of the

18 United States?

19 A    No.

20 Q    He -- you -- when Terence was young you all lived together

21 as a family, correct?

22 A    Yeah, since he was born.

23 Q    Well, many people don't have that luxury.  There's

24 divorces and things happen, but with your family you were all

25 together, correct?

1  A    We all together, yes, right.

2  Q    And then was in Delaware.  Is that correct?

3  A    In Delaware, yes.

4  Q    And he went to school there?

5  A    Yes.

6  Q    How did he do in school up until he became a high -- until

7  he graduated high school?  Put it that way.

8  A    He been doing very well in everything and almost a

9  straight A student, and then we always -- he -- we have -- in

10 Delaware it's a little bit different.  We have gifted Odyssey

11 Programs.  So that's government and provide and if you have a

12 very gifted pianist child and if they will pass the test; after

13 test, you know, you can go enroll with that programs.  And he

14 did real well in that programs, along with my daughter.

15 Q    All right.  Now, I understand that he was also quite

16 gifted at playing the piano.  Is that correct?

17 A    And he actually, right now, and if you go to the Google

18 and he still -- he still a Stanley and Son, Stanley and Son in

19 the young artists, and he made that.

20 Q    He went to Juilliard later on, did he not?

21 A    He went to the Juilliard for four years and same period in

22 a study, in a school, the regular school, and that was the same

23 period, and we think that's four years.

24 Q    Let me take a slight step back.  What is it that you do

25 for a living, ma'am?

1  A    Me?

2  Q    Yes, ma'am.

3  A    I work for the government and all the -- the court, the

4  Federal Court and also --

5  Q    What do you do?

6  A    I do also language, translate --

7  Q    All right.  You're an interpreter?  Is that correct?

8  A    Yes, interpreter, yes.

9  Q    And what languages are you licensed to interpret in,

10 ma'am?

11 A    I do five different Chinese dialects.

12 Q    Right.

13 A    And including Mandarin, Cantonese, Shanghai, Fuzhou and a

14 little bit of the Chiuchow.

15 Q    And how long have you been doing that for the courts,

16 ma'am?

17 A    Since I moved to the United States.

18 Q    And that's a full-time occupation for you, ma'am?

19 A    Actually, I do it individual, as independent, you know, as

20 independent contract, something like that.

21 Q    Yes, ma'am.

22 A    And there's no (indiscernible) call court, call me and in

23 need of my service, you know.  I just drive over to go.

24 Q    Okay.

25 A    And that's including city, New York and Baltimore and

1  Washington, D.C. and all over the country.

2  Q    Yes, ma'am.  And in what types of court do you typically

3  serve in, in your capacity as a interpreter?

4  A    The Federal Court and the (indiscernible) Court, the Court

5  of the counties and the -- that's what you're asking for?

6  Q    Yes, ma'am.

7  A    Yes.  And all of the court.  Any court if they call me,

8  administration call me, you know.  I'm just waiting to go.

9  Q    Yes, ma'am.  And what does your husband, Frederick, do for

10  a living?

11  A    My husband, he is a architect.

12  Q    Very good.  So moving back to your son, Terence Yung, was

13  he in high school did he have any disciplinary problems?

14  A    No.

15  Q    Did he have any problems with mental health issues?

16  A    No.

17  Q    Did he graduate near the top of his class in high school?

18  A    Yes.

19  Q    And he then attended Juilliard and received college

20  degrees.  Is that right?

21  A    Actually, you know, the Juilliard is a pre-college, pre-

22  college, and that's why, and regular high school with college.

23  They are same time can compete and can same time graduate.

24  That's, you know, this be the -- where the --

25  Q    Yes, ma'am.

1  A     -- you know, problems --

2  Q     Thank you.  Where did he go after he graduated high

3  school?  What did he do?

4  A     He want to University of Houston.

5  Q     Great.  All right.

6  A     And study with the king of the piano, sir, Abbey Simon.

7  Q     All right.  And --

8  A     He's one -- he's, you know, one of the youngest, Abbey

9  Simon, never accepted.  That's I know of.

10 Q     And how long was he at the University of Houston, ma'am?

11 A     Four years.

12 Q     Did he receive a degree from the University of Houston?

13 A     Two degree.

14 Q     Two degrees.  And what degrees were those?

15 A     In the music, music and that's including he received a

16 Steinway and Son, you know, young artists, and the other degree

17 is in honor college with language art, languages leadership,

18 something like that.

19 Q     Did he graduate near the top of his class?

20 A     Yes.

21 Q     And during that time did you receive any complaints or

22 become aware of any complaints regarding his behavior?

23 A     No.

24 Q     Did he exhibit any signs of mental illness, anything of

25 that nature?

1   A    No.

2   Q    Did he stay in touch with you?

3   A    He will stay with me after graduate from University of the

4   Houston.

5   Q    Yes.  So he --

6   A    And he got a scholarship, continuing study music, but he

7   has already made a Stanley and Son young artist, you know.  So

8   he says that he want to just pursuing [sic].

9   Q    Yes, ma'am.  So there came a time in spite of his degree

10  and his credentials as a classical pianist that he made a

11  decision that he wanted to go to law school.  Is that right?

12  A    Correct.

13  Q    And why did he apply to law school at?

14  A    Apply for the law school?  He applied like more than 10 of

15  them, maybe 20 of them, and he --

16  Q    And he was accepted into a great number of them, as well,

17  correct?

18  A    I think so, more than 10, including Cornell and U. Penn,

19  University of the Pennsylvania.

20  Q    And he elected to --

21  A    And UCLA.

22  Q    Yes, ma'am.  First could --

23  A    Something like that.  That's I just can't remember those

24  things.

25  Q    Yes, ma'am.  Well, we don't need a full list.  Cornell,

1  Pennsylvania, University of Texas and a number of others, yes?

2  A    Yeah, just that there's more than that.

3  Q    And he ended up going to the University of Texas, correct?

4  A    Right.

5  Q    And do you know why he chose the University of Texas?

6  A    Because you know, the University of the Texas, they gave

7  to him a merit full scholarship and those scholarship provide

8  from a dean.

9  Q    That's the dean's scholarship, also, and there's the

10  chancellor's scholarship.  Does that sound about right?

11  A    I don't know for sure he get that, that what is name of,

12  but you know, he received a full scholarship.  That is why he

13  went to the University of the Texas.

14  Q    You familiar with how he --

15  A    And also, he love Texas.

16  Q    Are you familiar with the grades that he got at the

17  University of Texas?

18  A    I think he could do pretty good, because he -- soon as he

19  do the law school he is already older than 21, 24 years old,

20  you know.  So I thought, you know, he's adult and I don't quite

21  ask him what his grade, but you know, the grade is okay, you

22  know; they -- you can check.

23  Q    Receive any complaints from anybody about his behavior?

24  A    No.

25  Q    And have you?

1  A    From school?

2  Q    Yes.  Or from the --

3  A    No.  I never receive that.

4  Q    And when he was at the University of Texas did you stay in

5  touch with him?

6  A    Yes.

7  Q    Talk to him all the time?

8  A    Yes.

9  Q    Visit him on holidays?

10  A    Actually, you know, every another week, you know, I see

11  him.  I see him, you know.

12  Q    Every other week?

13  A    Yeah.

14  Q    All right.

15  A    Of another week, you know, if I have time to see him, you

16  know.

17  Q    Any indications to you that he was suffering from some

18  kind of mental illness or anything like that?

19  A    No.

20  Q    So I called you yesterday on the phone and explained to

21  you that he'd been arrested and charted with this crime, right?

22  A    Yes.

23  Q    Did that come as a --

24  A    Is shock to me.

25  Q    You and I have also talked about -- and I think the

1   pretrial service officer has also talked to you about concepts

2   of third party custodian and being surety on a bond.  Is that

3   right?

4   A    Yes.

5   Q    So you understand that should the Court decide to let him

6   go, the Court may ask you to be a surety on a bond.  That means

7   that if he doesn't come to court you could lose your house or

8   up to $50,000 or whatever the bond amount is, right?

9   A    Yes, I understand that.

10  Q    You have -- and you're willing to do that?

11  A    I will.

12  Q    You have every confidence that he'll appear to court in

13  Delaware to answer charges?

14  A    Yes.

15  Q    All right.  And if the Court decided to appoint you as

16  third party custodian you'd be making a promise to the Court to

17  keep the Court aware of any changes in his behavior that would

18  indicate he wasn't complying with bond conditions, right?

19  A    Yes.

20  Q    And you would agree to do that?

21  A    Yes, I agree.

22  Q    To your knowledge, has Mr. Yung ever been arrested for

23  anything?

24  A    No.

25  Q    Besides this?

 1  A    No.

 2  Q    Has he ever received any --

 3  A    Whole my family, never involved with those things, you

 4  know.

 5  Q    To your knowledge, has he ever gotten so much as a traffic

 6  ticket?

 7  A    Never.

 8  Q    Does he drink?

 9  A    No.

10  Q    Does he --

11  A    Maybe a little bit of beer, you know, law school still

12  have it, you know.

13  Q    Are you aware that -- I mean, does he use drugs or

14  marijuana?

15  A    No.

16          MR. OLAVSON:  Pass the witness.

17                  CROSS-EXAMINATION

18  BY MR. DEVLIN:

19  Q    Good afternoon, Dr. Yung.  I'm Matthew Devlin.  I'm the

20  prosecutor here in Austin on this case.  And I'm going to just

21  ask you --

22  A    Good afternoon, sir.

23  Q    -- I'm going to ask you a few questions based on some of

24  the things that you were asked about.  First of all, when your

25  son lived in Houston did he live in an apartment there?

Yung - Cross/Devlin                          33

```
 1  A    Yes.

 2  Q    Do you recall if the address was 3001 Murwurth,

 3  M-u-r-w-u-r-t-h, Drive?

 4  A    Yes.

 5  Q    In Houston?  That was the name of the --

 6  A    Right.

 7  Q    -- street that he lived on?

 8  A    Right.

 9  Q    Correct?  When he came to Austin, did he live in Austin

10  only after he got into the University of Texas Law School?

11  A    Repeat the question again?  Sorry.  Slow a little down,

12  you know.

13  Q    I will.  I'm sorry.

14  A    Yeah.  I'm a little bit tired, yeah.

15  Q    I speak quickly.

16  A    Thank you, sir.

17  Q    Did he first come to Austin only after he came to UT Law

18  School?

19  A    No.  He stayed at the Delaware with me.

20  Q    Right.  Okay.

21  A    Two years.

22  Q    Okay.  So he graduated --

23  A    And he was here for the LSAT.

24  Q    So he graduated from the University of Houston and went to

25  live with you in Delaware?
```

 1  A     Two years.

 2  Q     Okay.  And in fact, you still live in Wilmington,

 3  Delaware.

 4  A     Right now, yes.

 5  Q     Is that right?

 6  A     Yes.

 7  Q     And after that he came to the university of -- he got into

 8  the University of Texas, decided to go to the University of

 9  Texas and moved to Austin?

10  A     Correct.

11  Q     And would that have been in the fall of 2014?

12  A     Yes.

13  Q     Okay.  So he was applying to law schools prior to that in

14  the spring of 2014?

15  A     Yes.

16  Q     All right.  You said he got into many law schools.  Were

17  there some law schools that he did not get into?

18  A     Yeah.

19  Q     Okay.

20  A     That's pretty normal.

21  Q     Do you remember which ones those might have been?

22  A     I don't remember, because I only excited when the people

23  call me, you, congratulations.  That's exciting.  So my --

24  that's, you know, me to pick up the phone, you know.

25  Q     Right.

 1  A    So other than that, you know, so.

 2  Q    Okay.  Was he living with you -- you live in Wilmington,

 3  Delaware, correct?

 4  A    Say again?

 5  Q    You live in Wilmington, Delaware?

 6  A    That is correct.

 7  Q    And still do?

 8  A    Right now, yes.

 9  Q    Yes.  Okay.

10  A    We living there more than 20 years.

11  Q    Okay.

12  A    The same house, the same party.

13  Q    Same house, okay.  And in fact, is that house on Country

14  Gates Drive?

15  A    18 Country Gates Drive.

16  Q    In Wilmington.  Okay.  Was he in Wilmington when he

17  learned about whether he got into the law schools he applied

18  to?

19  A    LSAT.

20  Q    I'm sorry?

21  A    He did LSAT.

22  Q    Right.  But --

23  A    L-S-A-T.

24  Q    Right.

25  A    LSAT, yeah.

1  Q    But he was in -- he was living with you in Wilmington when

2  he heard back from law schools?

3  A    Correct.

4  Q    Okay.  Do you remember when he heard back -- did he apply

5  to Georgetown University Law Center?

6  A    Georgetown, in Georgetown?  I don't quite really remember

7  Georgetown.  It's, you know, I don't quite remember.

8  Q    You don't remember if he applied there?

9  A    Perhaps.  I don't know.  I don't remember.  He applied for

10 many of the school and he just apply, you know, and some

11 school, you know, he just apply, you know.

12 Q    Did he have any top choices among the law schools?

13 A    Say again?

14 Q    Did he have any top choices that he -- where he wanted to

15 go to school?  Where would he want to go to school the most?

16 A    Of course, Yale and Harvard.

17 Q    Okay.  Any other schools?

18 A    That's schools, you know --

19          THE COURT:  Hold on a second.  Mr. Olavson.

20          MR. OLAVSON:  Sure.

21          THE COURT:  You need to get control of Mr. Yung.

22 He's playing eyeball games and mouthing helpful words to the

23 witness.  He's been doing it, and you know, we're not in a jury

24 trial.  I'm a big boy here, but you need to stop it, Mr. Yung.

25 Go ahead.

 1              DEFENDANT YUNG:  Yes.

 2   BY MR. DEVLIN:

 3   Q     Did he get into Harvard or Yale?

 4   A     No.

 5   Q     Okay.  Did you ever hear his reaction when he -- did you

 6   hear his reaction about Georgetown University, whether he got

 7   into that or not?

 8   A     I don't recall.

 9   Q     Okay.  When he moved to Austin did he live in an apartment

10   on Longview Street?

11   A     Yes, with his roommate.

12   Q     And who was his roommate?

13   A     I don't quite remember his name, but you know, right now

14   he's in (indiscernible) in Houston somewhere.

15   Q     Does the name --

16   A     He's --

17   Q     -- Dan Zang [sic] or Zhang, Z-h-a-n-g, does that ring a

18   bell?

19   A     That's the second one.

20   Q     That was his second roommate?

21   A     Second --

22   Q     I'm sorry.  Did you -- I didn't hear what you said.  That

23   was --

24   A     That's perhaps the second roommate, yeah.

25   Q     Okay.

1  A    The Chinese, right, Zhang, you know.

2  Q    His last -- I don't know him.  His last name is Zhang,

3  Z-h-a-n-g.

4  A    Right.

5  Q    Okay.  And how long did he live with Mr. Zhang?  And

6  hopefully, I'm pronouncing it right.

7  A    I don't quite remember.  Maybe probably a year or

8  something like that.

9  Q    Okay.  Did your son also work -- did Terence also work at

10 the Texas Attorney General's Office at some point?

11 A    Yes.

12 Q    Okay.  Do you remember when that was?

13 A    Not really.

14 Q    Now, there's been -- it's been talked about that he has

15 been on academic probation at the law school.

16 A    I -- I --

17 Q    Are you aware of that?

18 A    No.  I never received any paperwork from law school.

19 Q    No.  No.  He -- it was talked about today that he is on

20 academic probation at the University of Texas Law School.  Are

21 you -- do you know anything about that?

22 A    No.  Before I answer your question I like to ask you a

23 question back, make sure what you're asking me.

24 Q    Go ahead.

25       THE WITNESS:  Your Honor, can you allow me to do

  1  that?

  2            THE COURT:  Of course.

  3            THE WITNESS:  Okay.  You -- what your question was?

  4  BY MR. DEVLIN:

  5  Q    My question is, were you aware that he was on academic

  6  probation at the law school here?

  7  A    I never heard about that.

  8  Q    Okay.

  9  A    I never received any, you know, the school documentation.

 10  Q    I understand you may not have received --

 11  A    To me.

 12  Q    -- documentation, but did your son talk to you about it?

 13  A    No.

 14  Q    No?  Okay.  Did your son talk to you about applying to

 15  work for Judge Harry Lee Hudspeth?

 16  A    I don't know.  I don't remember, because you know, there's

 17  some other place he apply, whatever, you know.  He just told

 18  me, I thought this is not big deal, because you know, law

 19  school students apply for the job, you know, intern.  This is

 20  pretty normal.  Actually, before he went to the law school and

 21  he work for them.

 22  Q    Okay.

 23  A    You know, Capitol Hill in some of the senators' office,

 24  you know.  So and he doesn't need to tell me about which

 25  senator.  So I don't remember, you know.

1    Q    All right.

2            THE COURT:  Ms. Yung.

3            THE WITNESS:  Yes.

4            THE COURT:  Just listen to his question.  It was a

5    yes or no question.

6            THE WITNESS:  Okay.

7            THE COURT:  Just yes or no.

8    BY MR. DEVLIN:

9    Q    So you don't know anything about his --

10   A    No.

11   Q    -- going on at the law school.  Is the name Linda Corliss

12   (phonetic) familiar to you?

13   A    No.

14           MR. DEVLIN:  May I have one moment, Judge?

15       (Pause)

16   BY MR. DEVLIN:

17   Q    Do you know your son's email address?

18   A    The email address or the -- yes.

19   Q    Do you know -- can you tell us what it is?

20   A    Tyung@gmail.com.

21   Q    Okay.  Are you familiar with that address that's

22   TerenceHKYung@gmail.com?

23   A    Yeah.

24   Q    You're familiar with that?

25   A    Yeah.  Yeah.

1  Q    Okay.

2  A    Because really they have -- yeah.

3  Q    Okay.

4         MR. DEVLIN:  One moment, Your Honor.

5       (Pause)

6         MR. DEVLIN:  Okay.  I pass the witness, Judge.  Thank

7  you.

8         MR. OLAVSON:  One final question.

9                  REDIRECT EXAMINATION

10 BY MR. OLAVSON:

11 Q    I forgot to ask you, Ms. [sic] Yung, in addition to going

12 to school as a third year law student, was your son, Terence,

13 was he working?  Was he working, as well?

14 A    Yes.

15 Q    Prior to being arrested?

16 A    Yes.

17 Q    Earlier this week?

18 A    Before.

19 Q    Yeah.

20 A    But right now, it --

21 Q    Yes, right -- well, yeah.

22 A    -- before.

23 Q    Yeah, before he got arrested?

24 A    Prior, yeah.

25 Q    Right.

 1  A    And this year?

 2  Q    Yes.

 3  A    Yeah.  He work for the County DA's Office at Travis

 4  County, something like that, if I pronunciation is correct.

 5  Q    Travis County Attorney's Office?

 6  A    Right.

 7  Q    You know what he did there?

 8  A    He be the -- he work there.

 9  Q    Was he a secretary, an intern?  Do you know what he did?

10  A    The intern.

11  Q    Okay.

12          MR. OLAVSON:  Nothing further, Your Honor.

13          MR. DEVLIN:  I have nothing else.  Thank you, Judge.

14          THE COURT:  Dr. Yung, thank you for coming.  You can

15  step down.

16      (Witness excused)

17          THE COURT:  Mr. Olavson, do you have any additional

18  evidence you'd like to present?

19          MR. OLAVSON:  No, Your Honor.  Obviously, I have his

20  father, Frederick, and he would say substantially the same

21  things, and I do want the Court to note that he's present and

22  supportive, but I think he would -- it wouldn't be productive

23  of the Court's time, asking him the same series of questions.

24          THE COURT:  Yes.  Well, I do see him here and his

25  presence is noted.  Thank you.  As it relates to argument, the

1  burden being yours, Mr. Devlin, I'll let you go first.

2          MR. DEVLIN:  Thank you, Judge.

3              CLOSING ARGUMENT ON BEHALF OF GOVERNMENT

4          MR. DEVLIN:  First of all, I think the excerpt from

5  the search warrant affidavit is -- goes into some great detail,

6  as you've seen, and there's a lot of visual evidence, as well,

7  about the course of conduct here.  In March -- and I'm just

8  going to kind of quickly march through a very quick time line

9  here.

10         It appears in March of 2014 was his interview at

11 Georgetown with the victim.  Next day, March 21st, he sent a

12 thank you.  On April 1st he was denied admission to Georgetown

13 Law Center.  Then basically, nothing, although in August of

14 2014 a YouTube account that is referenced in there was made.

15         Now, nothing happened on that for a while.  There was

16 ultimately something posted on there that was problematic.

17 Suddenly in April of 2015 other things happened.  There was

18 Pinterest account that is reference in there, that was opened,

19 a Word Press blog account.

20         There was a LinkedIn account that associated the

21 victim with the KKK that was opened on April 14th, and there

22 was another Word Press blog account that was subsequently used.

23 May 2015, another derogatory LinkedIn account was formed.  It

24 was until the end of June of 2015 that the victim was even

25 aware that there were any problematic social media account out

Closing Argument - Devlin                    44

1   there that were making false claims about him.

2          Apparently, as a result of the victim's notification

3   to Pinterest, Pinterest shut down the account.  And then on

4   July 1st there was a new Pinterest account.  Beginning of July,

5   July 3rd to 5th, the escort account, the ECCIE accounts that

6   are referenced toward the end of the affidavit, were created.

7          Starting around July 9th of 2015, the victim starts

8   getting calls from escort services.  July 16th, there's a

9   Better Business Bureau complaint from this Linda Corliss and

10  there's another BBB complaint from a Thomas Carpal (phonetic)

11  that uses the variation of the defendant's Houston address that

12  I asked Mr. Yung about, trying to make believe it was in

13  Houston, Delaware.

14         Toward the -- I guess in the middle or end of July

15  the law firm hired by the victim starts -- files a civil suit

16  and start issuing some subpoenas to the social media sites.

17  And at the beginning of August of 2015 was when the altered

18  transcript was sent to Judge Hudspeth, and on August 6th,

19  within a couple of days apparently, after being notified, the

20  University of Texas put him on academic probation.

21         In September of 2015, another key date that I think

22  is important for this detention hearing, the law firm hired by

23  the victim started issuing subpoenas to LinkedIn and to the

24  various LinkedIn accounts.  There are at least I believe three

25  or four accounts.

1    And the significance of that, Judge, is talked about

2  in the affidavit, is that LinkedIn notified the holders of

3  those accounts by email or by some message that subpoenas had

4  been issued.  So presumably, the defendant, who we believe is

5  the one behind those accounts, was notified that someone was

6  taking some legal action and had at least caught up with what

7  he was doing.

8    In October and November there were some more Craig's

9  List postings, that is October, November 2015.  And it was

10  right at the end of October, between basically October 26 and

11  October 28th or so where people started showing up at the

12  victim's residence looking for someone with the same name, Ms.

13  Weyth (phonetic), that were probably based on some sexual ads

14  for Craig's List.

15    THE COURT:  Sorry.

16    MR. DEVLIN:  That happened on October 27th.  Oh, I'm

17  sorry.

18    THE COURT:  When was that and what was that again?

19    MR. DEVLIN:  That was October 26 of 2015, and I can

20  probably refer you to the paragraph.  It looks like it's in

21  paragraph 33 to about 30 -- no, a little bit -- 33 to about 43

22  or 44 is really the relevant area where all of this is

23  happening.

24    THE COURT:  All right.

25    MR. DEVLIN:  On October 27th there's reference to an

1  unknown Asian male who appeared at the residence.  And on the

2  same day, on October 27th, again, later in the affidavit,

3  there's a false posting about the victim on a website known as

4  startclass.com, which was apparently used to talk about

5  schools.

6       On October 28th, the next day, a neighbor of the

7  victim, someone who lived down the street, called 911 because

8  some man was looking for someone with the first name of the

9  victim's wife late at night, apparently in response to an

10 escort ad or some sort of sexual ad.

11      On October 29th there were false postings on a couple

12 of websites.  One is lawschools.com.  Another one was free

13 freeadvice.com, and on the same day, on October 29th, there

14 were comments on the Better Business Bureau website about the

15 victim's company, and that was traced back on that date to a

16 Texas Attorney General's Office IP address, and the

17 defendant -- Defendant Yung was working there on that very day.

18      We don't have the actual hours, but he posted four

19 and a half hours, which I believe is referenced in the

20 affidavit at -- just had it.  Paragraph 56 and 57 is basically

21 where that is, and 58.  Then we move into January of 2016.

22 there was an account on Fetlife, which is a -- I guess another

23 sexually oriented website that were basically trying to get men

24 to go to the victim's residence.

25      In March of 2016, March 27th of 2016, there was an

1   obituary, a false obituary listed under the victim's name on an
2   obituary website that was at least connected to these cases.
3   In April of 2016 there were some Twitter accounts and another
4   Fetlife account established.

5          On April 9th, 2016, and May 16th, 2016, there were
6   more Craig's List postings.  On June 30th of 2016 there was a
7   Twitter profile that was falsely made in the name of the
8   victim's son and it had a picture of the excerpt from the
9   Zapruder film of the JFK assassination that was posted there
10  that was interpreted to be very threatening under the
11  circumstances.

12         In August of 2016, on August 18th, the defendant
13  moved to his current residence and he was still accessing
14  various email accounts that had been associated with some of
15  these postings and these social media websites.  On September
16  25th of 2016, the rape stories about the victim, the false rape
17  stores were beginning to be posted on the Word Press blog
18  that's referenced toward the end of the affidavit.

19         Numerous stories are there, and in October of 2016
20  there were more postings.  Bottom line here, Judge, is that
21  this has been a protracted and lengthy -- I don't know how else
22  to put it -- but to call it an obsession with this victim.
23  This wasn't a one-time thing and he gave up.

24         This has been going on basically since April of 2015,
25  all the way through at least October of 2016 in many different

 1  forms and many different social media websites and things like

 2  that.  There have been sexual ads where people, strangers,

 3  complete strangers to both the defendant and to the victim show

 4  up at house.

 5      That's really the danger here.  This is -- he's

 6  causing people to respond to his house who nobody knows and

 7  nobody knows how they're going to react, especially under the

 8  circumstances.  If they're responding to some sort of sexual ad

 9  and they find out that it's a hoax or something, who knows how

10  they're going to react?

11      There's horrible stories about him on the Internet

12  about, you know, false rape allegations.  This has all been

13  done with the intent to harass and intimidate.  The JFK

14  picture, the assassination picture about -- associated with the

15  victim's son, that's designed to intimidate and harass.

16      There's so many things in this case that I think

17  really illustrate that this wasn't just a one-time thing and

18  that this was something that was much more insidious and

19  dangerous than it might appear.  While he may not himself have

20  been the person who was going to carry this out, he certainly

21  got people to respond under nefarious circumstances to this

22  victim's -- to the victim's house, and that's scary.

23      The violent sexual overtones that are expressed

24  throughout.  Paragraph 78, which he talks about violently

25  raping an eight-year-old girl, burning her chest with a cigar,

1  lighting her genitals on fire, those are all, again, associated
2  with the victim through himself, and they're false, but they're
3  there to just simply create an atmosphere of harassment and
4  intimidation.

5         Let's see.  The obituary, which was obviously
6  intended to kind of infer that he might be dead at some point
7  very soon was, again, designed to harass and intimidate through
8  these false postings.  The connections to the defendant I think
9  are also pretty clear.

10        Again, the address in Houston, the various email
11 addresses, the various IP addresses that are talked about in
12 the search warrant affidavit, the fact that he did this from
13 the Texas Attorney General's Office while he was there, as
14 well, the fact that he did this from Mr. Zhang's, Dan Zhang's
15 previous IP address that is talked about in there, as well, all
16 of those things connect the defendant pretty solidly to this
17 course of conduct that is just inexplicably long.

18        And to be honest, I haven't come up with why there
19 was such a delay between when he was denied admission to
20 Georgetown Law School and why he suddenly started going after
21 this poor victim.  I don't -- there was no further -- after the
22 interview for the position there's no further contact
23 whatsoever.

24        It was a very short interaction on one day.  He was
25 already at that University of Texas Law School under -- with a

1  scholarship.  Have no idea why he would be targeting this

2  particular victim so viciously and for such a long time.  But I

3  don't think it really matters.  The fact is that he was doing

4  that.

5        I guess he's the only one who can tell us that, and

6  he doesn't have to and he certainly did not.  But there has

7  been nothing that we can figure out at this point, or I can

8  figure out, anyway, why he was targeting him.  But

9  nevertheless, targeting on multiple platforms.

10       So Judge, one case that I would like to refer you to,

11 it's not terribly helpful because I'm about to recite in one

12 sentence basically the entirety of the opinion.  But there's a

13 case called the United States v. Latigo, L-a-t-i-g-o.  It's at

14 616 Fed.Appx. 182.  It's a Fifth Circuit case, dated September

15 24, 2015.

16       It has to do with a cyber stalking case similar to

17 this, and this is basically the entirety of the opinion.  "The

18 evidence as a whole supports the District Court's determination

19 that the defendant over the Internet and in person has engaged

20 in conduct designed to cause substantial emotional distress to

21 the victim, and presents a physical threat to" -- in that case

22 it was a female victim -- "to her, and that he would continue

23 to do so if released pending trial."

24       So it basically upheld a judge's determination that a

25 person under very similar circumstances with a similar offense

1  be detained pending disposition of the case.  This case,

2  though, again, it's not a one- or two-time thing.  It's going

3  on and on and on, and it seems to come in chunks.

4       And I thought that's why the time line was a little

5  bit helpful, because things happened -- a chunk of things

6  happen in April of 2015.  A chunk of things happen in July.  A

7  chunk of things happen in October of 2015, and yet, even after

8  he was notified by LinkedIn that someone might be onto him

9  about something, the conduct continued.

10      And it -- this continued all the way till October of

11 this year.  It would be nice to have some more recent things

12 and maybe there are those things out there, but that's the most

13 recent that the investigation could establish.  So I think that

14 we have a lot of things here.

15      Obviously, his mom didn't know what he was up to.  I

16 don't think there was any question about that.  She doesn't

17 live here.  All of this has been done from here in Texas while

18 he's been going to law school.  I hope that you do -- the

19 reason I've made a little bit of a big deal about the Judge

20 Hudspeth situation is that he knowingly lied to a judge.

21      He knowingly lied to a court.  He was a law student

22 at the time, and I know -- I think that is -- that demonstrates

23 what regard he might have for any conditions that you may put

24 on him.  And speaking of that, if there is any consideration by

25 you to put him on conditions I would argue that they would be

1  inadequate.

2          I know that the Court will probably impose some

3  pretty serious computer restrictions.  First of all, he doesn't

4  have any computers left as a result of the search warrant.

5  Secondly, based on what he was doing, which was getting onto

6  social media accounts, getting onto these sexual websites,

7  getting onto Craig's List and all that, can be done from any

8  computer.

9          He can go to another Austin Public Library.  He can

10  go to the UT Law Library, get on the computers and no one would

11  know.  And so I don't think that that kind of condition is

12  going to be sufficient to keep him from engaging in this

13  conduct.  And because this conduct is cyber stalking, it's

14  stalking by computer, if you will, I think that's yet another

15  reason why the conditions wouldn't be sufficient and that

16  detention is appropriate in this case.

17          So for the reasons that are -- the evidence before

18  you and all of these different factors that I hope the Court

19  will take into consideration, we would ask that you detain him

20  pending trial.

21          THE COURT:  Before hearing from Mr. Olavson.

22          MR. OLAVSON:  Yes.

23          THE COURT:  This is not a presumption case, correct?

24          MR. DEVLIN:  Correct.

25          THE COURT:  And what is the statutory penalty range

1  after your review of the statute, in your opinion?

2          MR. DEVLIN:  The maximum is five years.

3          THE COURT:  Okay.  That's what I thought.  And then

4  not that it necessarily weighs into my decision, but what are

5  your instructions as it relates to the U.S. Attorney's Office

6  in Delaware as it relates to whatever decisions I make one way

7  or the other?

8          MR. DEVLIN:  I have consulted with them specifically

9  and asked them what they would do in the event that you did

10 order his release on bond, and I have been informed that they

11 would seek a stay or reconsideration of that decision from the

12 district judge up there.

13         THE COURT:  And that's not to say that they

14 necessarily -- the judge up there would grant it.

15         MR. DEVLIN:  Correct.

16         THE COURT:  But that's their intention?

17         MR. DEVLIN:  Yes, sir.

18         THE COURT:  Okay.

19         MR. DEVLIN:  And that'd be done under section 35 --

20 3145(a)(1), I believe it is.

21         THE COURT:  Okay.  Mr. Devlin, thank you, sir.

22         MR. DEVLIN:  Thank you.

23         THE COURT:  Mr. Olavson, sir.

24         MR. OLAVSON:  Yes, sir.  Thank you, Your Honor.

25         THE COURT:  Sure.

Closing Argument - Olavson                          54

1       MR. OLAVSON:  I do appreciate you working through the

2  lunch hour.

3       THE COURT:  No.  No.

4       MR. OLAVSON:  Thank you so much.

5       THE COURT:  Things lined up.  I mean, frankly, I

6  would reset this for tomorrow under normal circumstances, but

7  I'm cognizant of the fact that you've got some schedule

8  commitments.  So do I.  So as you know, I apologize to

9  everybody for taking this through the noon hour.  So --

10      MR. OLAVSON:  Well, I'm grateful.  So thank you.

11  Thank you, Judge.

12      THE COURT:  You're welcome.

13        CLOSING ARGUMENT ON BEHALF OF DEFENDANT

14      MR. OLAVSON:  Just to kind of move backwards so I

15  don't forget, I did have a brief conversation with the Chief

16  Federal Public Defender for the Judicial District in Delaware.

17  That's Ed Bostick, is his name.  And he said, look, I'm

18  probably going to get this case.

19      I've told him that the financial affidavit, at least

20  down here, precluded representation by the PD's Office, but he

21  seemed optimistic that he would get appointed to it.

22      THE COURT:  Okay.

23      MR. OLAVSON:  I did briefly kind of discuss with him

24  the nature of the judge that this is assigned to.  I believe

25  that's Leonard Stark, if I remember that correctly.  And at

1  least, you know, for what it's worth, Judge, Mr. Bostick was at

2  least the same line, that I should be able to prevail in this

3  bond hearing, if that gives you some insight at to the eventual

4  disposition there.  I know that's pretty attenuated, guessing

5  what people might do, but --

6          THE COURT:  No, but I mean, I'm glad you shared that

7  with me.  I need to know.

8          MR. OLAVSON:  -- it's what I got on the subject.

9  I've read the search warrant affidavit.  I know you have, too,

10  Your Honor.  You signed it last week, and I'd be an inhuman

11  clod if I stood up here and I tried to say that that isn't a

12  long and lengthy history of terrible things.

13          I mean, I think all of us have a -- you know -- a

14  nightmare that that would happen to us.  So I don't mean to

15  downplay that one bit, Judge.  And for all the things that I

16  hopefully have pointed out, the utter lack of criminal record,

17  no mental illness, no drug and alcohol use, certainly no

18  weapons, nothing like that.  You don't see anything.

19          THE COURT:  But doesn't the affidavit give us pause

20  when we talk about mental illness?

21          MR. OLAVSON:  Yes, sir.

22          THE COURT:  I mean, it's a level of -- I've never

23  seen anything like it in all my years.

24          MR. OLAVSON:  Yes, sir, yes.  But -- yes.  But I

25  mean, if he had had similar episodes, this Mr. Yung had similar

Case 1:17-cr-00014-LRS Document 79-2 Filed 02/12/18 Page 56 of 68 PageID #: 569
Case: 1:12-334 Document: 0031126738089 Page: 86 Date Filed: 07/13/2017

1   episodes, I think that might give us even greater pause.  I

2   mean, obviously, what we're all -- we all want to make sure of

3   is, is this going to happen again.

4        If he gets out on bond is he going to continue to

5   cyber stalk or is he going to present an actual, physical

6   threat to these poor victims.  And I'm arguing here for the

7   sake of his family that, you know, it's not proven that it is

8   him.  He's told me that he's not guilty of these charges.

9        But just for the sake of the argument here today,

10  it's just easier for me to speak to how are we going to make

11  sure the victims' safe.  What can we do -- Mr. Yung is accused

12  of a crime, but not convicted of it -- to make sure that that

13  doesn't happen.

14       And it's -- I think it's relatively easier to insure

15  the physical safety of the people in Delaware because we can

16  have Mr. Yung be here in Texas and put him on a monitor and he

17  would have to travel across the entire country to get into

18  actual proximity to the victims.

19       What Mr. Devlin says is problematic.  How do we know

20  he's not going to be on a computer?  We can order him not to be

21  on a computer.  I mean, the Court does these things all the

22  time, primarily with various species of sex offenders.  And if

23  he did get on the computer and posted something, I think the

24  results would be draconian and swift for Mr. Yung.

25       But I guess the one thing that I have to emphasize is

1  to the question of, can it stop, is it has stopped, Your Honor.

2  There hasn't been any incident since October of 2016.  It has

3  come to an end.  Whoever is doing this to these poor people,

4  it's over.

5          And I think if you put him on incredibly strict

6  conditions, including a monitor, no access to computers of any

7  type, I think that will insure the safety of the public.  We

8  have a guy that's looking at a maximum of five years here.

9  He's not going to run off.  He's a United States citizen.

10         His parents will sign a bond.  It's a very close

11  family.  I don't think the risk of nonappearance is an issue.

12  I mean, his family has already gotten in touch with the Public

13  Defender's Office in Delaware.  They're making preparations to

14  deal with this.

15         And I do think that given the complete lack of

16  criminal history, he's entitled to release on a bond with the

17  most stringent of conditions, Judge.

18         THE COURT:  Thank you, Mr. Olavson.

19         Mr. Devlin, anything else?

20         MR. DEVLIN:  I guess the only comment that I would

21  have is that I think when I emphasize that things happen in

22  chunks in this case, there was a period of time that things

23  happened.  Then there was a period of time that things didn't.

24  So I'm not sure that the lack of any evidence of things from

25  October is terribly relevant under the circumstances and under

1   the course of conduct in this case.  So thank you.

2          THE COURT:  All right.  I know you all -- everyone

3   here has been patient, but you're going to have to give me 10

4   to 15 minutes.  I need to read Government Exhibits 2, 3 and 4.

5   I'm already, of course, familiar with Government Exhibit Number

6   1, which is the affidavit.  But I want to read those.  I want

7   to look at the -- do you have that case that I -- the Latigo

8   case that you --

9          MR. DEVLIN:  I can get it for you.

10          THE COURT:  Okay.

11          MR. DEVLIN:  Yes.  I can print it out.

12          THE COURT:  All right.  And then so I will come back

13   out anywhere between 10 and 15 minutes from now.  Thank you.

14          THE CLERK:  All rise.

15                         (Recess)

16          THE CLERK:  All rise.

17          THE COURT:  Okay.  All right.  Mr. Yung, people who

18   are arrested on federal crimes are entitled to be released on

19   the least restrictive conditions that a judge can set that can

20   provide some assurance that you'll appear in court when you're

21   supposed to, and minimize or eliminate the risk that you pose

22   to the community or any person in the community.

23          It's not a presumption case.  So this is just a

24   straight up review of your history, your background, as well as

25   the nature and circumstances of the offenses that have been

Decision - The Court                          59

1  committed.  Title 18, United States Code section 3142 governs

2  the Court's review and the determination of whether or not

3  conditions should be set or whether or not someone warrants

4  detention.

5          I'm instructed to review several factors.  One of

6  them is the nature and circumstances of the offense that's

7  charged.  Second is the weight of the evidence against the

8  person.  The third is the history and characteristics of the

9  person.

10         This takes into account things like your character,

11  family ties, employment, those type of things.  And lastly, the

12  nature and seriousness of the danger to any person or the

13  community that would be posed by the person's release.  I'm not

14  going to beat around the bush with you, Mr. Yung.

15         I'm going to order that you be detained pending

16  further proceedings in your case.  If some judge up in Delaware

17  wants to release you, that's their business.  But whether this

18  case is from Delaware or here in Austin, Texas, I'd order your

19  detention every single time, every single time.

20         And the reason for that, quite simply, is in my 25

21  years of being involved in the criminal justice system, I won't

22  say I've never, but this is top two or three of the worst cases

23  of stalking I have ever seen in my life.  Now, you have a

24  presumption of innocence and you should hang onto that and

25  clutch that for all it's worth.

1    But one of the factors is the weight of the evidence

2  against a person.  I've read the affidavit.  It's 98 pages

3  long, I think.  I think that what -- evidence against you is

4  overwhelming.  So that factor of the four that I just described

5  clearly weighs against you.

6    The nature and circumstances of the offense, again,

7  they weigh against you, as well.  Over -- between 18 months and

8  23 months or so, depending on who's counting, you clearly

9  engaged in a campaign designed to scare, terrorize, victimize

10 innocent people, and I can't for the life of me understand,

11 just because you got rejected by Georgetown Law School?

12    My goodness.  We're a bunch of lawyers in this room.

13 We all got rejected by law schools, I'm sure.  Yet, you

14 harbored such an incredible grudge, and here's the disadvantage

15 for your poor parents who are sitting out there.  You're too

16 old for them to come to your rescue at this point.

17    You've got enough water under the bridge.  This --

18 the responsibility for your life at this point is on you, but

19 your parents don't have the advantage of being able to read

20 through this affidavit.  Wait -- they're going to, and I trust

21 -- trust me, they're going to be ashamed of your conduct,

22 absolutely ashamed and mortified and not understand how you

23 could be spending so much time, so long after somebody

24 disappoints you.

25    And I digress for a second.  The victim in this case

1  is clearly somebody of wealth, and I think about the poor

2  people out there who don't have the means by which to hire a

3  law firm to begin to chase you down and interact with the

4  Federal Bureau of Investigation in Delaware and get their

5  interest in this case.

6          What would those people do?  And then lastly, I'll

7  tell you, I've reviewed Government Exhibit Number 2, which is

8  the affidavit from the wife of the victim, and if you want to

9  hear -- you want to read a heart-wrenching tale of the

10  destruction you cause in their life, read this.  Let your

11  parents read it later on when they have the opportunity.

12          Bottom line is, some judge -- and I'm fully

13  comfortable with this -- may authorize your release on

14  conditions down the road, but it's not going to be me.  I find

15  that the government has met their burdens by a preponderance of

16  the evidence that you're a risk of flight.

17          Unfortunately, you've managed to put your citizenship

18  as a United States citizen at risk with your conduct in this

19  case.  Oh, yes, that's right.  Upon conviction you very well

20  may be deported and removed from the United States.  Number

21  two, I find that you're a danger to the community.

22          I find that you represent a continuing threat and

23  danger to the poor people that you started victimizing up in

24  Delaware, that you represent a threat to attempt to obstruct

25  justice, and maybe injure somebody.  Injury can be a physical

1    injury, but it can also be you continuing to sustain this

2    campaign of malevolence towards these poor people.

3         And unfortunately, in this particular instance your

4    intelligence works against you, because you're fully capable of

5    working around any restrictions that I set as it relates to

6    access to computers, the Internet.  You were intelligent enough

7    to do this for so long and get away with it.

8         It just -- it's shocking.  So I'm going to enter a

9    written order that's going to summarize what I've just

10   described and more, and then we'll let other judges decide

11   whether I'm right or not.  But for now, I cannot in good

12   conscience authorize your release.  I couldn't sleep at night.

13        THE CLERK:  All rise.

14                         *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

1                           <u>CERTIFICATE</u>

2         I, ELIZABETH REID-GRIGSBY, a certified electronic

3 transcriber, certify that the foregoing is a correct

4 transcript, to the best of the transcriber's ability, from the

5 official electronic sound recording of the proceedings in the

6 above-entitled matter.

7

8 <u>/s/ Elizabeth Reid-Grigsby</u>    Date:   <u>June 5, 2017</u>

9 Elizabeth Reid-Grigsby - AAERT CET**00145

10 J&J COURT TRANSCRIBERS, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25